## A00A1738. SANDERS v. THE STATE.
(538 SE2d 470)

JOHNSON, Chief Judge.

Brian Cordell Sanders was indicted on charges of murder, felony murder, and cruelty to children in connection with the death of his nine-week-old daughter. After a jury trial, he was convicted of involuntary manslaughter, as a lesser included offense of the murder charge, and cruelty to children. He was found not guilty of felony murder. Sanders appeals, contending that the evidence was insufficient to support the involuntary manslaughter conviction and that the trial court erred in failing to direct a verdict of acquittal on the

---

cruelty to children charge. We disagree with these arguments and affirm the convictions.

1. On appeal, we do not reweigh the evidence but view it in a light most favorable to the verdict.[1] So viewed, the evidence shows that Sanders and the child's mother, Saundra Reddick, rushed the infant to the hospital when her body became limp and her breathing abnormal. When they arrived at the hospital, the child was in a coma.

At the hospital, several doctors examined the child. Dr. Robert Chambliss found ruptured blood vessels in the area between the infant's brain and skull, swelling of the brain, and bleeding between the eyes and back of the eyes. In Dr. Chambliss' opinion, the injuries were caused by the child being shaken.

Dr. James Lindley, a neurologist, also examined the child. Dr. Lindley determined that the infant had minimal if any brain stem reflexes and very little body movement. In Lindley's opinion, she suffered from an irreversible brain injury and probably would not survive the injury.

Dr. Donna Evans examined the child and found that her injuries were consistent with "shaken-baby syndrome." According to Dr. Evans, the child's injuries resulted from a violent shaking and were similar to injuries which result from a massive car accident or a fall from a second-story building. Dr. Evans noted that the child also had a broken leg which occurred around the time the fatal injuries were inflicted.

A child abuse investigator with the Department of Family & Children Services interviewed the couple at the hospital. The investigator testified that Sanders said that he had been carrying the infant into the kitchen when he accidentally bumped her head on a wall corner, causing a cut on the baby's forehead. Reddick put an ointment on the cut, and Sanders put the child to bed. A short time later, the baby began crying. Sanders told the investigator that he went into the bedroom and shook her to quiet her down.

Reddick testified that after Sanders put the child to bed, she heard her crying and started to go to the infant's room, but Sanders stopped her and told her he would take care of the child. Sanders was alone in the room with the child for "more than a minute," then the crying stopped. A short time later, Reddick went into the child's room and saw Sanders sitting down, holding the infant. Sanders remarked: "Something [is] wrong with her." Sanders held her up, and the child's eyes "rolled back in her head and her arms just dropped." Reddick noticed that the baby was breathing abnormally, and she

---

[1] See *Price v. State*, 222 Ga. App. 655, 657 (2) (475 SE2d 692) (1996).

immediately rushed the child to the hospital.

An agent with the Georgia Bureau of Investigation ("GBI") testified that he spoke with Sanders at the hospital. Sanders admitted to the agent that he had shaken the infant in order to quiet her down. Sanders said he shook her for about ten to fifteen seconds while holding her by the rib cage. The videotaped interview was admitted into evidence.

Sanders testified on his own behalf. He stated that after he placed the baby in bed, she started crying. He picked her up, sang her a song, and laid her back down. The infant was fine at that time. Sanders went outside for ten or fifteen minutes, then came back in and quickly picked up the baby when he saw Reddick coming down the hall. He wanted Reddick to think he had been taking care of the baby the entire time, but he had not. When he picked up the child, he noticed something was wrong with her. He believed someone else had picked up the child while he was outside. He testified that he did not shake the child, just "cradled" her. On cross-examination, Sanders stated that he had taken a parenting class in which he learned that a baby could be seriously injured if shaken "real hard."

The child remained on life support for approximately two weeks, then died. An autopsy revealed bleeding around the spine, the spinal cord, the surface of the brain and the brain coverings, and four broken ribs. The forensic pathologist testified that, in his opinion, the child had been held by the chest, the chest had been squeezed, and the child had been shaken "very violently." He determined that the infant's death was caused by someone violently shaking her.

The other members of the household testified that they had no contact with the child at the time the injuries occurred and that they never dropped, shook, or injured the child in any way.

Considering evidence showing the nature and extent of the injuries suffered by the infant, the cause of the injuries, and that Sanders squeezed and shook the infant just before she lapsed into a coma, a rational trier of fact was authorized to find Sanders guilty beyond a reasonable doubt of involuntary manslaughter and cruelty to children.[2]

2. Sanders contends that because the jury found him guilty of involuntary manslaughter, the trial court erred in not directing a verdict of acquittal on the cruelty to children charge. He urges that malice is required for a cruelty to children conviction, but that there was no evidence of malice. To support his argument, he points to the fact that the jury found him guilty of involuntary manslaughter,

---

[2] See *Powell v. State*, 271 Ga. 575 (1) (522 SE2d 656) (1999); *George v. State*, 220 Ga. App. 223, 225 (1) (469 SE2d 360) (1996).

which does not require malice, but not guilty of felony murder or murder, which require malice. This argument is without merit.

In Georgia, consistency in the verdict is not necessary, and every count of an indictment is regarded as if it is a separate indictment.[3] Thus, even if the verdicts are inconsistent, reversal is not required.

In any event, the two verdicts are indeed consistent. Under OCGA § 16-5-3 (b), a person commits the crime of involuntary manslaughter when he causes the death of another without any intention to do so, by committing a lawful act in an unlawful manner likely to cause death or great bodily harm. A person commits the offense of cruelty to children within the meaning of OCGA § 16-5-70 (b) when he maliciously causes a child cruel or excessive physical or mental pain. In this case, the jury could have found from the evidence both that Sanders maliciously caused the infant excessive pain and that his actions caused the infant's death, though he may not have intended to kill her.

Contrary to Sanders' argument, there is evidence of malice supporting the cruelty conviction. On cross-examination, Sanders admitted that he knew that shaking a baby "too hard" could seriously injure her. And he admitted to a GBI agent that he held the nine-week-old child on the ribs and shook her for ten to fifteen seconds. Medical evidence showed that the baby had been shaken so severely that she suffered extensive bleeding throughout the spinal cord and that she had been squeezed so tightly that her ribs were broken. Thus, the evidence supports an inference of malice. The trial court did not err in failing to direct a verdict of acquittal on the child cruelty charge.[4]

*Judgment affirmed. Smith, P. J., and Phipps, J., concur.*

DECIDED AUGUST 15, 2000.

*Hal T. Peel*, for appellant.
*J. Thomas Durden, Jr., District Attorney, Jeffery N. Osteen, Assistant District Attorney*, for appellee.

---

[3] *Wilson v. State*, 234 Ga. App. 375, 376 (2) (506 SE2d 882) (1998).
[4] See generally *Morris v. State*, 202 Ga. App. 673, 674 (415 SE2d 485) (1992).